IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs March 3, 2025

## IN RE GABRIEL F.

**Appeal from the Juvenile Court for Sumner County**
**No. 2023TPR6        David Howard, Judge**

_____

### No. M2024-00800-COA-R3-PT

_____

This appeal involves a petition to terminate parental rights.  The juvenile court found by clear and convincing evidence that two grounds for termination existed as to the father: (1) abandonment by an incarcerated parent and (2) failure to manifest an ability and willingness to assume custody.  The juvenile court also determined that termination was in the child's best interest. The father appeals.  We vacate in part, affirm in part, and reverse in part, but ultimately affirm the termination of the father's parental rights.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Vacated in Part, Affirmed in Part, and Reversed in Part**

CARMA DENNIS MCGEE, J., delivered the opinion of the court, in which THOMAS R. FRIERSON, II, and JEFFERY USMAN, JJ., joined.

Lee W. McDougal, Gallatin, Tennessee, for the appellant, Melvin N.

Jonathan Skrmetti, Attorney General and Reporter, and Katherine P. Adams, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

### OPINION[1]

### I.        FACTS & PROCEDURAL HISTORY

This appeal arises from the termination of the parental rights of Melvin N. ("Father"), the appellant, to his son, Gabriel F.  Many of the facts and the procedural history in this matter also involve Gabriel's mother, Regina F. ("Mother"), and the termination

_____

[1] In cases involving minor children, it is the policy of this Court to redact the parties' last names to protect their identities.

petition also concerned her parental rights. Mother's rights to Gabriel were terminated in the same order as Father, but she has not appealed. Therefore, this appeal only concerns the termination of Father's parental rights.

Gabriel was born in May 2020 and was in Mother's custody. Father was incarcerated a few months after his birth. At some point in August 2021, Mother and Gabriel became homeless. After a few days of homelessness, Mother accepted an invitation for her and Gabriel to move in with a man, and soon after arriving, Mother engaged in drug use in the home. Mother passed out in the home, and the man went for help. When help arrived, Mother was found unresponsive in her car and was transported to a hospital while experiencing cardiac arrest due to an overdose. The Department of Children's Services received a referral on August 15, 2021, as one-year-old Gabriel was in the car when medical assistance arrived. On August 18, 2021, DCS filed a petition for dependency and neglect, seeking an award of temporary legal custody to a maternal great step-aunt, a finding of severe child abuse, and the scheduling of an emergency hearing based on alleged drug exposure by Mother. Father was incarcerated at the time. Gabriel was placed with his maternal great step-aunt for a few months. Father was released from incarceration for about six weeks during this period but soon returned to incarceration.

Later, an amended petition for dependency and neglect was filed on March 1, 2022, due to the aunt's voluntary surrender of custody. At that time, Mother was again homeless, and Father was still incarcerated, so Gabriel entered the foster care system by an *ex parte* order entered the same day. On January 30, 2023, an order was entered finding Gabriel dependent and/or neglected as to both Father and Mother. Gabriel was also determined to have been a victim of severe child abuse as to Mother only, due to Mother's use of drugs in Gabriel's presence and subsequently losing consciousness.

On June 22, 2023, when Gabriel was three, DCS filed a petition to terminate the parental rights of both Mother and Father. As to Father, the petition specified grounds of: (1) "ABANDONMENT BY INCARCERATED PARENT/WANTON DISREGARD T.C.A. §§ 36-1-113(g)(1) and 36-1-102(1)(A)(iv), -102(1)(B), -102(1)(C), -102(I)(D) and -102(1)(E)" and (2) "FAILURE TO MANIFEST AN ABILITY AND WILLINGNESS TO ASSUME CUSTODY T.C.A.4 36-1-113(g)(14)." The matter went to trial on March 8, 2024. Mother did not appear at trial, but Father was transported from jail to attend, and was represented by appointed counsel.

Initially, Father stated he did not wish to participate in the proceedings because it was unfair to terminate his parental rights as he had "never done anything to [Gabriel] or any other child for him to be kept from me and taken from me in this manner." The trial court then explained the nature of the proceedings and eventually, Father agreed to participate in the hearing. Subsequently, Father was the first witness called to testify.

Father initially stated that he had been incarcerated since December 14, 2022. However, Father later stated that he had been mistaken and he had actually been incarcerated on December 14, 2021, two years prior to trial. When asked what crime he had been charged with, Father stated, "I plead the Fifth on that" as "it doesn't have nothing to do with my child." Father then stated that he did not know what he was charged with as he had not seen an attorney, and when he had been to court, had remained in a holding cell. Father was asked when he anticipated he would be released, to which he responded, "I don't know. Sometime very soon." Father was then asked about his anticipated living situation upon release, to which he responded only that he intended to "get [ ] a house somewhere." He was then asked about Gabriel. Father stated that Gabriel was three years old, and the last time he had seen him in person was in June or July of 2020, shortly after his birth. He also stated that he had a "video visit" with Gabriel sometime the previous year.

Father was next asked about his criminal history. Father stated that he had previous convictions, but again, refused to discuss any specifics as he did not believe it was relevant. After some encouragement from the trial court, Father stated that his previous conviction "was a drug case." Father went on to explain that he had sold cocaine to a "confidential informer," and this had resulted in his previous incarceration for approximately seven years. He later explained that this conviction occurred in 2012, and while he had not incurred any subsequent drug convictions, he had a previous conviction approximately five years prior. Father explained that he had been released from incarceration on December 10, 2018, but was reincarcerated for a parole violation on August 12, 2020, about three months after Gabriel's birth. Father indicated that he was incarcerated from August 12, 2020, until November 1, 2021, and then was rearrested on December 14, 2021. Later, the guardian ad litem asked more specifically about his drug convictions, and specifically how many he had over the course of his life. Father's only response was, "Lord Jesus, I don't know." Regardless, Father insisted that he was not "struggling" with drugs, but rather, that the sale of cocaine was his "means of income." When asked about this, Father indicated that he had been selling drugs for approximately 20 years.

On cross-examination, Father was asked about the time between his previous and present period of incarceration. He claimed that he tried to locate Mother by inquiring about her around the neighborhood and on Facebook. He stated that Mother initially answered his Facebook messages, but she quickly cut off contact with him. He stated that he "never did get a chance to talk to her and ask her where [Gabriel] was." Father stated that he had inquired about using the legal process to obtain custody and had been quoted different prices for doing so but he "hadn't made it there yet." Father's counsel asked whether hiring an attorney was a financial bar from doing that, to which he stated yes. Father also described various items he purchased for Gabriel, including diapers, milk, clothing, a new stroller, and other items. He later testified that these items were stolen out of a storage locker and he had never delivered them because Mother was not able to accept the items. He claimed that he continued searching for Mother daily until his

reincarceration. Father also explained his relationship with Mother. He stated that she informed him she was pregnant in approximately November 2019 and afterwards, he "picked her up" any time she needed food, and he would take her to doctors' visits, but she was not living with him. He indicated their relationship was "off and on" and also stated that Mother would "come and see [him]" and "stay a day or two, two or three days" but then would go stay with the father of her other children. However, he claimed he supported her during the pregnancy.

The guardian ad litem also asked questions of Father. Father stated that he had been in the same room as Gabriel "about three or four times." He stated that while he was incarcerated representatives of DCS had brought some papers regarding Gabriel and informed him of their desire to perform a DNA test to establish parentage. He stated that he initially refused but later did submit to the test in June 2022. Father then explained that he had attempted to maintain contact with DCS, however, DCS did not return his calls and only sent him paperwork.

Father next testified regarding his plans once he got out of jail. He stated that he intended to begin a landscaping business, detail service, and catering business as his means of income. When asked if he would begin selling drugs again, Father responded, "[n]o, I can't." The court also had some questions for Father. The court asked about a child support order. Father acknowledged that he was ordered to pay $100 per month in child support but had never paid it. However, Father claimed that he had made at least one payment, stating, "they got, like, a check for, like, [$]1,400. I don't know if they got the [$]1,200, but, yeah, they got, like [$]1,400 off me so far." This concluded Father's testimony.

Next, Destiny Riggins was called to testify. Ms. Riggins is a family service worker with Sumner County DCS and Gabriel's caseworker. She began by testifying regarding her experience with Mother, but also answered some questions relevant to Father. She stated that she was not aware of Father having provided any kind of support for Gabriel since he entered foster care and was unaware of any $1,400 payment. She stated that Gabriel is doing very well in his current placement, and he is "really just active" and "doesn't know any stranger." She also stated that "he loves going to school," which is what Gabriel calls daycare. She stated that he refers to his foster mother as "Mama" and views his foster sister as his sister. Ms. Riggins also stated that Father is not currently working with DCS services as he is incarcerated, but DCS would be willing to work with him upon release.

On cross examination, Ms. Riggins was asked about her contact with Father. She stated that he had attempted to reach her twice and left a voicemail. She stated she had attempted to return his call, but the facility would not allow her to speak with him. She stated that her experience had shown the facility Father is in "is more limited on who they allow in and out of their facility."

Finally, Gabriel's foster mother testified. She stated that Gabriel has resided in her home since March 1, 2022, when he was one year old. She also has a daughter living in the home. The foster mother stated that Gabriel was "doing great," and she has had no trouble getting him to any doctor's appointments or to daycare and is able to provide for him financially. She stated the last contact Gabriel had with Father was a 2023 child and family team meeting call with DCS, but Gabriel had never had an in-person visit with Father since coming into her custody. She stated that Gabriel did not know who Father was during the call and did not refer to him as "Dad." She stated that Father acted appropriately during the call. She also explained that she had never received any financial support or other gifts from Father for Gabriel. The foster mother stated that Gabriel had bonded well with both her and her daughter, and that she planned to adopt Gabriel if the opportunity arose.

This concluded the proof, and the hearing concluded after closing arguments. The trial court entered a final order on May 3, 2024, in which it determined DCS had proven by clear and convincing evidence that two grounds existed to terminate Father's parental rights: abandonment by an incarcerated parent, and failure to manifest an ability and willingness to assume custody. The trial court also determined that DCS had shown that termination of Father's parental rights was in Gabriel's best interest.[2] Father filed this appeal.

## II.    ISSUES PRESENTED

Father presents the following issues for review on appeal, which we have slightly reframed:

1. Whether the juvenile court erred in finding that DCS met its burden by clear and convincing evidence that grounds existed to terminate Father's parental rights.
2. Whether the trial court erred in finding that DCS met its burden by clear and convincing evidence to demonstrate it was in the best interest of the child to terminate Father's parental rights.

For the following reasons, we affirm in part and reverse in part the decision of the juvenile court.

## III.    STANDARDS APPLICABLE TO TERMINATION CASES

---

[2] The trial court also determined that grounds existed for the termination of Mother's parental rights based on findings of severe child abuse and failure to manifest an ability and willingness to assume custody of Gabriel. The trial court found it was in Gabriel's best interest for the parental rights of Mother to be terminated. Mother did not appeal this ruling.

"A parent's right to the care and custody of [his or] her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re Neveah M.*, 614 S.W.3d 659, 674 (Tenn. 2020) (quoting *In re Carrington H.*, 483 S.W.3d 507, 521 (Tenn. 2016)). "Parental rights have been described as 'far more precious than any property right.'" *Id.* (quoting *In re Carrington H.*, 483 S.W.3d at 522). "No civil action carries with it graver consequences than a petition to sever family ties irretrievably and forever." *In re Kaliyah S.*, 455 S.W.3d 533, 556 (Tenn. 2015). Nevertheless, parental rights are not absolute. *In re Carrington H.*, 483 S.W.3d at 522.

Tennessee Code Annotated section 36-1-113 "sets forth the grounds and procedures for terminating the parental rights of a biological parent." *In re Kaliyah S.*, 455 S.W.3d at 546. Pursuant to this statute, the petitioner seeking termination of parental rights must prove two elements. *Id.* at 552. First, the petitioner must prove the existence of at least one of the statutory grounds for termination set forth in Tennessee Code Annotated section 36-1-113(g). *Id.* Second, the petitioner must prove that termination of parental rights is in the best interests of the children under the factors set forth in Tennessee Code Annotated section 36-1-113(i). *Id.* Due to the constitutional dimension of the rights at stake, the petitioner seeking termination must prove both elements by clear and convincing evidence. *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010); *see* Tenn. Code Ann. § 36-1-113(c). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005), and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596 (citing *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002); *State, Dep't of Children's Servs. v. Mims (In re N.B.)*, 285 S.W.3d 435, 447 (Tenn. Ct. App. 2008)).

We review a court's factual findings de novo in accordance with Rule 13(d) of the Tennessee Rules of Appellate Procedure, presuming each factual finding to be correct unless the evidence preponderates otherwise. *In re Carrington H.*, 483 S.W.3d at 523-24. We then make our own determination regarding "whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights." *Id.* at 524 (citing *In re Bernard T.*, 319 S.W.3d at 596-97). As for conclusions of law, "[t]he trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness." *Id.* (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)).

## IV. DISCUSSION

### A. Grounds for Termination

#### 1. *Abandonment by an Incarcerated Parent*

The first ground for termination the trial court considered in this case was abandonment by an incarcerated parent. At the time the petition was filed, this form of abandonment was defined by statute as occurring where:

[a] parent . . . is incarcerated at the time of the filing of a proceeding, pleading, petition, or amended petition to terminate the parental rights of the parent . . . of the child who is the subject of the petition for termination of parental rights or adoption, or a parent . . . has been incarcerated during all or part of the four (4) consecutive months immediately preceding the filing of the action and has:

(a) Failed to visit, has failed to support, or has failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding the parent's . . . incarceration;

(b) Failed to visit, has failed to support, or has failed to make reasonable payments toward the support of the child during an aggregation of the first one hundred twenty (120) days of nonincarceration immediately preceding the filing of the action; or

(c) With knowledge of the existence of the born or unborn child, engaged in conduct prior to, during, or after incarceration that exhibits a wanton disregard for the welfare of the child[.]

Tenn. Code Ann. §§ 36-1-102(1)(A)(iv)(a)-(c) (2023).[3] This definition "'contains multiple ways of abandonment for termination of parental rights.'" *In re Navada N.*, 498 S.W.3d 579, 598 (Tenn. Ct. App. 2016) (quoting *In re Kierra B.*, No. E2012-02539-COA-R3-PT, 2014 WL 118504, at *8 (Tenn. Ct. App. Jan. 14, 2014)). The parent's "incarceration is a condition precedent for this definition of abandonment." *In re Trenton B.*, No. M2022-00422-COA-R3-PT, 2023 WL 569385, at *3 (Tenn. Ct. App. Jan. 27, 2023) (citing *In re Navada N.*, 498 S.W.3d at 598). Importantly, "the parent's incarceration serves only as a triggering mechanism that allows the court to take a closer look at the child's situation to determine whether the parental behavior that resulted in incarceration is part of a broader pattern of conduct . . . ." *In re Audrey S.*, 182 S.W.3d at 866. Accordingly, the statute provides additional circumstances that, when coupled with the parent's incarceration, lead to the conclusion the parent abandoned the child. Tenn. Code Ann. § 36-1-102(1)(A)(iv)(a)-(c) (2023).

---

[3] This portion of Tennessee Code Annotated has been amended since the filing of the petition for termination on June 22, 2023. We quote and analyze the statute as enacted when the petition was filed.

In his brief, Father acknowledges that he was incarcerated at the time the petition was filed and thus, the condition precedent for abandonment by an incarcerated parent is satisfied. However, Father claims the trial court erred when it determined DCS proved by clear and convincing evidence that he failed to visit, support, and make reasonable payment towards Gabriel's support and by finding he displayed a wanton disregard for Gabriel's well-being.[4] We address both claims in turn.

### a. Failure to Visit, Support, and Make Reasonable Payments Toward the Child's Support

The trial court determined DCS established by clear and convincing evidence that Father abandoned Gabriel by incarceration through failure to visit, support, or pay reasonable child support. The trial court appears to have applied both Tennessee Code Annotated sections 36-1-102(1)(A)(iv)(a) and (b) as it determined Father failed to visit, support, or pay reasonable child support during both the four consecutive months immediately preceding Father's incarceration and the aggregation of 120 days of non-incarceration prior to Father's incarceration.

However, DCS has conceded the ground of abandonment by an incarnated parent for failure to support or make reasonable payments toward support. Accordingly, we reverse the trial court's findings as to this ground. *See In re Jaylan J.*, No. W2019-02025-COA-R3-PT, 2020 WL 7861378, at *12 (Tenn. Ct. App. Dec. 22, 2020); *In re Colton B.*, No. M2018-01053-COA-R3-PT, 2018 WL 5415921, at *6 (Tenn. Ct. App. Oct. 29, 2018) ("[W]hen the petitioner who sought termination has conceded on appeal that a ground was not sufficiently proven, this Court has, in several cases, reversed the trial court's finding as to that ground without reaching the merits of whether the ground was actually established."); *In re Zane W.*, No. E2016-02224-COA-R3-PT, 2017 WL 2875924, at *7 (Tenn. Ct. App. July 6, 2017) (reversing a ground that DCS "does not defend" and noting that *Carrington* "has never been construed to require this Court to also consider the grounds sustained by the trial court and thereafter conceded or waived by the non-parent on appeal").

Further, upon review of the record, the petition filed by DCS contains no mention of allegations of failure to visit. Nor are the specific subsections of the statute outlining this form of abandonment by incarceration referenced in the petition, as only Tennessee Code Annotated section 36-1-102(1)(A)(iv) broadly is cited, with a reference only to sections "36-1-102(1)(A)(iv), -102(1)(B), -102(1)(C), -102(1)(D) and -102(1)E" stated.[5]

---

[4] Father also argued that the trial court used an incorrect time period when assessing the applicability of Tennessee Code Annotated section 36-1-102(1)(A)(iv)(b). It appears that Father refers to a requirement imposed in the updated version of the statute. *See* Tenn. Code Ann. §§ 36-1-102(1)(A)(iv)(b)(1)-(2). (2024). As stated above, we apply the version of the statute in place at the time the petition was filed which does not carry the referenced differentiation.

[5] Tennessee Code Annotated sections 36-1-102(1)(B), -102(1)(C), -102(1)(D), and -

The petition only specifically references abandonment by an incarcerated parent by way of wanton disregard and only describes wanton disregard in the portion of the petition alleging the conduct serving as the basis for this ground of termination. As we have previously stated, "[e]nsuring that each ground alleged was properly pled is a critical issue in termination cases." *In re Noah A.*, No. E2019-01633-COA-R3-PT, 2020 WL 6538461, at *8 (Tenn. Ct. App. Nov. 6, 2020). Additionally, we have explained that:

> courts must "strictly apply the procedural requirements in cases involving the termination of parental rights." *Weidman v. Chambers*, No. M2007-02106-COA-R3-PT, 2008 WL 2331037, at *6 (Tenn. Ct. App. June 3, 2008) (citing *In re W.B. IV.*, No. M2004-00999-COA-R3-PT, 2005 WL 1021618, at *10 (Tenn. Ct. App. Apr. 29, 2005); *In re M.J.B.*, 140 S.W.3d 643, 651 (Tenn. Ct. App.2004)). Providing notice of the issues to be tried is considered a fundamental component of due process. *In re W.B. IV.*, 2005 WL 1021618, at * 13 (citations omitted). The pleadings limit the ruling to the grounds of termination alleged, "because to find otherwise would place the parent at a disadvantage in preparing a defense." *See* [*I*]*d.* at *10[.]

*In re Landon H.*, No. M2011-00737-COA-R3-PT, 2012 WL 113659, at *4 (Tenn. Ct. App. Jan. 11, 2012). Here, we cannot say that DCS properly pled abandonment by an incarcerated parent for failure to visit pursuant to either Tennessee Code Annotated section 36-1-102(1)(A)(iv)(a) or (b). Neither subsection is specifically cited, and the paragraphs explaining the ground only consider Father's arrests and pre-incarceration conduct and claim that this constitutes wanton disregard for Gabriel's safety. We have previously determined that a parent was not given sufficient notice of grounds for termination and accordingly dismissed those grounds. *See In re Noah A.*, 2020 WL 6538461 at *8-9 (vacating the trial court's finding that DCS established abandonment by incarcerated parent for failure to visit where the petition did "not list failure to visit as a reason why the ground applie[d]."); *In re Landon H.*, 2012 WL 113659 at *7 (vacating the trial court's termination on the ground of abandonment by wanton disregard because Father "was not given notice of the ground upon which termination of his parental rights was based.")

We would note that it is possible for a ground to be tried without being raised in the petition where the parent consents either expressly or implicitly. *See In re Noah A.*, 2020 WL 6538461 at *8. For an issue to be tried by consent, there must be evidence demonstrating that the parties understood the ground was being tried. *In re W.B., IV*, No. M2004-00999-COA-R3-PT, 2005 WL 1021618, at *13 (Tenn. Ct. App. Apr. 29, 2005) (stating that "[w]hile it is true that parties may try an issue not raised in the pleadings by express or implied consent" that did not occur where nothing in the record indicated "the parties had any reason to believe that the court was considering another ground.") The

102(1)(E) contain definitions of "token support," "token visitation," "failed to support" or "failed to make reasonable payments toward such child's support," and "failed to visit."

record in this case does not suggest Father was aware this ground was being argued. In addition to the ground not being referenced in the petition, it was not listed among the alleged grounds for termination at the beginning of trial. Further, the questions asked of Father regarding his visitation with Gabriel, while relevant to this ground, were also relevant to other issues being pled. *See In re Eimile A.M.*, No. E2013-00742-COA-R3-PT, 2013 WL 6844096, at \*5 (Tenn. Ct. App. Dec. 26, 2013) (stating that "it must be clear from the record that the evidence presented relevant to the unpled ground had no relevance to any other issue being presented to the Trial Court.") Further, the proper four-month period was not adequately discussed at trial. *See In re Haskel S.*, No. M2019-02256-COA-R3-PT, 2020 WL 6780265, at \*6 (Tenn. Ct. App. Nov. 18, 2020) (determining the four-month period was not "tried by consent because there was never a definitive agreement on what that period should be.") Here, we cannot say that Father implicitly or explicitly consented to trial of this unpled issue. Accordingly, we must vacate the trial court's determination that Father abandoned Gabriel by incarceration through failure to visit pursuant to Tennessee Code Annotated §§ 36-1-102(A)(iv)(a).

### b. Wanton Disregard

The trial court determined that Father abandoned Gabriel by exhibiting a wanton disregard for Gabriel's safety and welfare. Father claims that the trial court erred when it determined he exhibited a wanton disregard because not enough evidence was submitted to clearly and convincingly show he engaged in the type of bad acts and poor judgment contemplated by the statute. "We have repeatedly held that probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of the child." *In re Audrey S.*, 182 S.W.3d at 867-868 (citing *State Dep't of Children's Servs. v. J.M.F.*, No. E2003-03081-COA-R3-PT, 2005 WL 94465, at \*7-8 (Tenn. Ct. App. Jan.11, 2005), *perm. app. denied* (Tenn. Mar. 21, 2005); *In re C. LaC.*, No. M2003-02164-COA-R3-PT, 2004 WL 533937, at \*7 (Tenn. Ct. App. Mar. 17, 2004); *In re C.T.S.*, 156 S.W.3d 18, 25 (Tenn. Ct. App. 2004); *In re C.W.W.*, 37 S.W.3d 467, 474-75 (Tenn. Ct. App. 2000)).

Having reviewed the record, we find that it supports the trial court's determination that DCS proved the ground of abandonment by an incarcerated parent through wanton disregard for the child's welfare by clear and convincing evidence. The record shows that Father has a long record of criminal activity resulting in multiple arrests after Gabriel's birth. Shortly after Gabriel's birth Father was arrested for a parole violation relating to a previous conviction for the sale of drugs to a police informant. He was released on November 1, 2021, but was arrested again on December 14, 2021, and has remained incarcerated since that time. Father has also failed to pay his court ordered child support. Even if Father did make a $1,400 payment at some time, this does not constitute consistent and substantial financial support. These actions display a wanton disregard for Gabriel's welfare; therefore, we affirm the trial court's ruling as to this ground.

## 2. *Failure to Manifest an Ability and Willingness to Assume Custody of the Child*

The trial court also determined that DCS proved by clear and convincing evidence the ground of failure to manifest an ability and willingness to assume custody of the child. This ground exists where a parent:

> has failed to manifest, by act or omission, ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child.

Tenn. Code Ann. § 36-1-113(g)(14). To prove this ground, the petitioner must prove two elements. *In re Neveah M.*, 614 S.W.3d at 674. The first element is that "the parent . . . failed to manifest an ability and willingness to personally assume legal and physical custody or financial responsibility of the child." *Id.* This element is satisfied by "clear and convincing proof that a parent . . . has failed to manifest either ability or willingness." *Id.* 677. "A parent's ability to assume custody or financial responsibility is evaluated based 'on the parent's lifestyle and circumstances.'" *In re Trenton B.*, WL 569385, at *6 (quoting *In re Zaylee W.*, No. M2019-00342-COA-R3-PT, 2020 WL 1808614 at *5 (Tenn. Ct. App. Apr. 9, 2020)). Further, "[w]hen evaluating willingness, we look for more than mere words." *In re Jonathan M.*, No. E2018-00484-COA-R3-PT, 2018 WL 5310750, at *5 (Tenn. Ct. App. Oct. 26, 2018). The second element is to show that "placing the child in the parent's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child." *In re Neveah M.*, 614 S.W.3d at 674-75.

Gabriel entered DCS custody on March 11, 2022, after his maternal step-aunt voluntarily surrendered custody. At that time, Father was incarcerated and thus, could not have assumed custody. Similarly, when DCS filed the petition for termination, Father was still incarcerated and could not have assumed custody. Father claims that he did attempt to contact DCS thereafter but was unsuccessful, and testimony did indicate that DCS services were not available to him during his incarceration. Despite this, the trial court determined Father had not demonstrated a willingness to take custody of Gabriel. Importantly, while Father was aware of Gabriel's birth and did see him three or four times during the early months of his life, Father took no steps to establish parentage or obtain custody of the child. Parentage was not established until June 2022, at the request of DCS. Further, Father initially resisted DCS's efforts to assist him with establishing parentage.

As to his ability to assume custody, Father's incarceration stands as a large obstacle preventing him from being able to take custody of Gabriel. While incarceration alone does not prevent a parent from being a parent, we have previously found that a "lifestyle of repeated incarceration poses a risk of substantial harm to" a child's welfare, and thus the

- 11 -

father had not demonstrated an ability to assume custody. *In re Trenton B.*, 2023 WL 569385, at \*7. Here, Father's almost continuous incarceration has prevented him from forming any meaningful connection with Gabriel. Further, there is no indication as to when Father will be released from his current incarceration. Father's constant re-incarceration also indicates that even if he were released, the permanency of Gabriel's placement with him would be unstable.

As to a threat of substantial harm, the trial court determined that Father's criminal history and lack of involvement in Gabriel's life indicates a severe risk of harm to Gabriel if he were placed with Father. We agree. Father's criminal history indicates that Gabriel would be placed into a potentially dangerous situation if he were put into Father's custody. Finally, Gabriel has clearly formed bonds with his foster family, and the destruction of those bonds to place Gabriel with Father, who is basically a stranger to him, would pose a risk of harm.

Since Gabriel has entered DCS custody, Father has not demonstrated a willingness or ability to assume custody. Further, Father's lifestyle of selling drugs and repeated incarceration poses a risk of substantial harm to Gabriel. Therefore, we conclude that the juvenile court did not err when it determined that DCS proved this ground for termination by clear and convincing evidence.

## B. Best Interests of the Child

Having determined that the trial court did not err when it found DCS proved the statutory grounds existed by clear and convincing evidence, we now consider whether the termination of Father's parental rights was in the best interest of the child. The factors to be considered are set out in Tennessee Code Annotated section 36-1-113(i), which states:

> (i)(1) In determining whether termination of parental . . . rights is in the best interest of the child, the court shall consider all relevant and child-centered factors applicable to the particular case before the court. Those factors may include, but are not limited to, the following:
>
> (A) The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;
>
> (B) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;
>
> (C) Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;

(D) Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;

(E) Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;

(F) Whether the child is fearful of living in the parent's home;

(G) Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;

(H) Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;

(I) Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;

(J) Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner;

(K) Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;

(L) Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;

(M) Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

(N) Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;

(O) Whether the parent has ever provided safe and stable care for the child or any other child;

(P) Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

(Q) Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;

(R) Whether the physical environment of the parent's home is healthy and safe for the child;

(S) Whether the parent has consistently provided more than token financial support for the child; and

(T) Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

Tenn. Code Ann. § 36-1-113(i)(1). Many of these factors are interrelated, therefore, we address many of them in concert.

First, we consider those interrelated factors concerning Gabriel's need for stability and continuity of placement, the effect a potential change of caretakers and physical environment would have on Gabriel, and his parental attachments and emotionally significant relationships with persons other than parents and caregivers. Tenn. Code Ann. § 36-1-113(i)(1)(A), (B), (H), and (I). Gabriel has experienced stability in his foster home, where, by all accounts, he is treated as a member of the family, is provided for financially, and is taken to all doctor's appointments and daycare. Further, Gabriel has developed strong bonds with both his foster mother, whom he refers to as "Mama," and with his foster sister, whom he views as his sister. This stands in contrast to Gabriel's relationship with Father, with whom he has been in the same room only three or four times as an infant, whom he has spoken to once via video chat, and with whom there is no meaningful bond. Therefore, we find that factors (A), (B), (H), and (I) weigh in favor of termination.

Next, we consider the interrelated factors concerning Gabriel's interest in stable and secure housing and parenting. Tenn. Code Ann. § 36-1-113(i)(1)(C), (D), (E), (F), (G), and (O). Father has not demonstrated any continuity or stability in meeting Gabriel's

needs. Father was incarcerated shortly after Gabriel's birth and appears to have never actually parented him, having only been in the same room as Gabriel three or four times. He has never provided Gabriel with any safe and stable care. Further, Father has not provided consistent and substantial financial support to Gabriel since he has entered foster care. Father and Gabriel also share no parental or emotional attachment as Father has been incarcerated for the vast majority of Gabriel's life and made no significant contact with him during his short periods of release. There is no indication that Father has or would be able to cultivate a healthy parental relationship with Gabriel. Father has had no in person contact with Gabriel since August 2020 and since then, has had one brief virtual visit. Thus, we find that factors (C), (D), (E), and (O) weigh in favor of termination. We would note that additional factors exist pertaining to the child's interest in a stable home. Tenn. Code Ann. § 36-1-113(i)(1)(F)-(G). However, because Gabriel has never resided with Father these factors are neutral in this case.

As for factors (L) and (K), which both concern the reasonable efforts of DCS to assist the parent and the parent's inclination to engage in DCS offered services, it does not appear that DCS made any substantive efforts to assist Father or that any programs were available to Father. However, this was due to Father's incarceration for the duration of DCS's involvement, and the unwillingness of the facility housing Father to permit DCS employees into the facility or to make telephone calls to Father. Thus, for reasonable efforts to have been made, Father must have first been released from jail. Consequentially, this factor does not weigh in favor of or against termination. Similarly, there was no evidence concerning any issues of Father's brutality, physical, sexual, emotional, or psychological abuse toward the child, as he has had little contact with the child, and the only virtual visit was appropriate. Tenn. Code Ann. § 36-1-113(i)(1)(N). Thus, factor (N) does not weigh in favor of termination.

Regarding factor (S), Father testified that he had never made his ordered $100 per month child support payments. Tenn. Code Ann. § 36-1-113(i)(1)(S). Father did claim that at some point, he made a payment of between $1,200 and $1,400. The testimony of both Ms. Riggins and the foster mother cast doubt on this payment having been made, as both stated that Father has not paid any support since Gabriel entered foster care. Even if this payment was made, it does not represent consistent and substantial financial support. Thus, this factor weighs in favor of termination.

Finally, we consider the interrelated factors concerning the parent's adjustment of circumstances detrimental to the child's environment, health, and psychosis. Tenn. Code Ann. § 36-1-113(i)(1)(J), (M), (P), (Q), (R) and (T). Father has not adjusted the circumstances preventing him from caring for Gabriel. He is still incarcerated with no inclination as to when he will be released. Further, his criminal history and admitted long-term profession as a drug dealer suggest these circumstances will not change. Additionally, Father has not demonstrated any urgency in establishing parentage, seeking custody of Gabriel, or adjusting his conduct. He failed to establish parentage of Gabriel until he was

already two years old, despite an awareness of his birth, and never sought custody. Further, Father has consistently separated himself from Gabriel through his continued legal scruples and subsequent periods of incarceration, of which the present period apparently has no imminent end. Father has also failed to demonstrate an ability to provide a home or financially for Gabriel upon release. Father's testimony as to his living situation upon release from prison was only that he would obtain a house, without any indication as to where or how, and his job prospects were limited to his vague intention to start a landscaping, detailing, and catering business. Finally, concerning Father's emotional maturity, the trial court determined based on its observation of Father's testimony, when combined with his extensive criminal history indicated that it was a concern. We agree. Therefore, factors (J), (M), (P), (Q), (R), and (T) each weigh in favor of termination of Father's parental rights.

Having reviewed the best interest factors, we agree that it is in Gabriel's best interest for Father's parental rights to be terminated. Therefore, we conclude that the trial court did not err when it determined termination was in the best interest of Gabriel.

## V. CONCLUSION

For the reasons stated above, we vacate in part, affirm in part, and reverse in part the decision of the trial court, but ultimately affirm the termination of the parental rights of Father, Melvin N. Costs of this appeal are taxed to the appellant, Melvin N., for which execution may issue if necessary.

_____
CARMA DENNIS MCGEE, JUDGE